(No. 53453

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. LANCE GATES *et al.*, Appellees.

*Opinion filed June 26, 1981.*

Tyrone C. Fahner, Attorney General, of Springfield, and J. Michael Fitzsimmons, State's Attorney, of Wheaton (Melbourne A. Noel, Jr., Assistant Attorney General, of Chicago, and Robert L. Thompson, Assistant State's At-

torney, and James Salsbury, law student, of Wheaton, of counsel), for the People.

James W. Reilley and Barry E. Witlin, of Chicago, for appellees.

MR. JUSTICE WARD delivered the opinion of the court:

On May 3, 1978, the Bloomingdale police department received by mail an anonymous handwritten letter which alleged that Susan Gates and Lance Gates, her husband, were planning to travel to Florida in a few days for the purpose of obtaining illegal drugs. The letter read:

> "This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida where she leaves it to be loaded up with drugs, then Lance flys [sic] down and drives it back. Sue flys [sic] back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,000.00 worth of drugs in their basement.
>
> They brag about the fact they never have to work, and make their entire living on pushers.
>
> I guarantee [sic] if you watch them carefully you will make a big catch. They are friends with some big drugs dealers, who visit their house often.
>
> Lance & Sue Gates<br>Greenway<br>in Condominiums."

The chief of police delivered the letter to Charles Mader, a detective of the Bloomingdale police department and he requested one of the department's radio operators to seek assistance from the Secretary of State's office in Springfield in obtaining a specific address for the

Gateses. That office advised that an Illinois driver's license had been issued to a Lance Gates residing at a stated address in Bloomingdale. Mader then communicated with a confidential informant who had, he claimed, provided reliable information to Mader during the previous two years. Upon examining certain financial records to which the informant had access, he reported a new address on Greenway Drive in Bloomingdale for the Lance Gates who had previously resided at the address in Bloomingdale furnished by the Secretary of State's office.

Upon inquiry, Mader was told by an officer of the Chicago police department assigned to O'Hare Airport that "L. Gates" had made a reservation with Eastern Airlines on its flight 245, which was to depart from O'Hare on May 5, at 4:15 p.m. The final destination of the flight was West Palm Beach, Florida.

On May 5, Mader was told by William Morely, an agent of the Drug Enforcement Administration, that "Lance Gates" had boarded Eastern Airlines flight 245 bound for Florida. The following day Morely informed Mader that Gates had arrived in West Palm Beach, had proceeded by cab to the West Palm Beach Holiday Inn, and had entered a room registered to Susan Gates. Agent Morely told him that he observed Gates and an unidentified woman leave the room at 7 a.m. and enter a red-vinyl-over-gray Mercury with 1978 Illinois license number RS 8437. Records at the Secretary of State's office showed that the license plate was registered for Lance B. Gates, but had been issued for a different automobile.

Based on the anonymous letter, the described information obtained from the law-enforcement authorities, and the verification of the address obtained from the confidential informant, Mader, on May 6, sought and obtained in the circuit court of Du Page County, a search warrant for both the Gateses' residence in Bloomingdale and the car they were driving from Florida.

At 5:15 a.m. on May 7, Lance and Susan Gates returned by car to their home on Greenway Drive. They were immediately served with a search warrant by waiting Bloomingdale police officers. In the trunk of the Mercury the officers found several large bundles of marijuana weighing a total of approximately 350 pounds. A search of the Gateses' residence uncovered more marijuana. weapons, ammunition, drug paraphernalia, and several scales presumably used for weighing the drugs. Police also ascertained that the couple had cocaine in their possession. They were indicted for unlawful possession of cannabis with intent to deliver and unlawful possession of a controlled substance. Lance Gates was separately indicted for possession of an unlicensed firearm.

The defendants filed a pretrial motion to quash the search warrant and to suppress all physical evidence obtained as a result of the search, arguing that the anonymous letter did not set forth the underlying circumstances or manner in which the informant acquired the information or that the information was reliable as required under the test for probable cause described in *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509. The defendants also argued that the separate evidence obtained by Detective Mader in his independent investigations did not corroborate the anonymous informant's accusations that the Gateses were involved in criminal activity so as to support the issuance of a search warrant based on probable cause. The motions to quash and to suppress evidence were allowed by the circuit court of Du Page County, and its action was affirmed by the appellate court (82 Ill. App. 3d 749). We granted the State's petition for leave to appeal. 73 Ill. 2d R. 315(a).

Both the Constitution of the United States (U.S. Const., amend. IV) and the Constitution of Illinois (Ill. Const. 1970, art. I, sec. 6) provide assurance against

unreasonable searches and seizures of person and property. The determination of probable cause for the issuance of a search warrant must be made by a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." (*Johnson v. United States* (1948), 333 U.S. 10, 14, 92 L. Ed. 436, 440, 68 S. Ct. 367, 369.) This determination also must be based upon the sworn observations or on other sufficient facts or circumstances presented under oath before a magistrate. The Supreme Court in *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, considering its decisions in *Giordenello v. United States* (1958), 357 U.S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245, *Johnson v. United States* (1948), 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367, *Nathanson v. United States* (1933), 290 U.S. 41, 78 L. Ed. 159, 54 S. Ct. 11, and *United States v. Lefkowitz* (1932), 285 U.S. 452, 76 L. Ed. 877, 52 S. Ct. 420, announced the constitutional standard to be used by courts in deciding whether a search warrant might properly issue when the complaint for the search warrant is based in whole or in part upon information supplied by an anonymous or unidentified informant. The court stated:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant [citation], the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed [citation], was 'credible' or his information 'reliable.' " 378 U.S. 108, 114, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509, 1514.

The first part of this standard or test is often referred

to as the "basis of knowledge prong" and the second part as the "veracity prong."

In *Aguilar,* an officer of the Houston police department applied for a search warrant on the ground that " 'reliable information [had been received] from a credible person' " that the defendant was known to have drugs on his premises for purposes of sale and personal use. The court described the affidavit as containing " 'no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein' " or "that the affiant's unidentified source 'spoke with personal knowledge.' " The court further stated that "the source here merely suspected, believed or concluded that there were narcotics in petitioner's possession. The magistrate here certainly could not 'judge for himself the persuasiveness of the facts relied on *** to show probable cause.' He necessarily accepted 'without question' the informant's 'suspicion,' 'belief' or 'mere conclusion.' " (378 U.S. 108, 109, 113-14, 12 L. Ed. 2d 723, 725, 728-29, 84 S. Ct. 1509, 1511, 1513-14, quoting *Nathanson* and *Giordenello.*) The court held that the evidence obtained from a search conducted with the warrant was inadmissible and remanded the case for further proceedings.

The first prong, or the "basis of knowledge" part of the test announced in *Aguilar,* is concerned with the facts and circumstances showing that the informant knew that the person named has been or will be involved in criminal conduct. The most common means of satisfying this requirement is by the informant's declaration that he is revealing personal knowledge gathered through some physical sensory faculty such as that of sight, smell or sound. (See, *e.g., Stanley v. State* (1974), 19 Md. App. 507, 531, 313 A.2d 847, 861.) Statements containing mere conclusions of criminal activity without a statement regarding independent facts and personal observations do not provide a sufficient basis for a neutral

magistrate to decide to issue a search warrant.

Looking at the anonymous handwritten letter here one can only observe that it does not contain any statement showing that the information was acquired through firsthand or personal knowledge of the informant. The informant states that the defendants make their living by selling drugs but he does not set out the source of this knowledge or the ground for his conclusion. There is the statement that the defendants boasted of their illegal occupation, but one does not know whether they made these comments to the informant or whether this was hearsay. Similarly, the informant states that the defendants will be returning from Florida with over $100,000 in drugs and that there is over $100,000 worth of drugs in their basement. No basis of knowledge for this is given. There is no statement made that the informant ever saw drugs or was inside the defendants' residence or even that someone had told him of any of these claimed facts. The letter set out mere conclusions and contained no statements of personal observation or firsthand knowledge.

The second part of the *Aguilar* test, often, as noted, referred to as the "veracity prong," requires a showing of the underlying circumstances from which it was concluded that the informant was " 'credible' " or his information " 'reliable.' " (378 U.S. 108, 114-15, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509, 1514.) Though it is not necessary to consider this "prong" where the "basis of knowledge" part has not been satisfied, we shall comment on it because of the State's arguments discussed later relating to self-verifying detail and corroborating evidence as support for the search warrant here.

The name of an informant need not be revealed to the magistrate before a search warrant is issued so long as it is established that the informant is credible. This requirement is usually satisfied by reciting in the affidavit previous instances in which the affiant police officer has

obtained information from the informant that led to various arrests and convictions. (See *McCray v. Illinois* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056; *People v. Garcia* (1975), 27 Ill. App. 3d 396.) Here, the informant's identity was not known to the affiant, Detective Mader. There was simply no basis on which either Mader or the magistrate could conclude that the anonymous person was credible.

The failure to satisfy under *Aguilar* that the informant was credible does not of itself mean that the "veracity prong" requirement cannot be met. It may be satisfied by a showing that the informant's tip was reliable. *United States v. Harris* (1971), 403 U.S. 573, 29 L. Ed. 2d 723, 91 S. Ct. 2075, shows that a plurality of the court considered that the alternative requirement of reliability of the information supplied was satisfied where the informant, in giving the information, admitted activities which were against his penal interest. In *Harris* a warrant was issued to Federal and local officers permitting them to enter and search the defendant's premises where they found containers of whiskey on which the Federal tax had not been paid. The affidavit accompanying the request for a warrant stated that information was received from an individual who claimed, as a confederate, personal knowledge that the defendant was a "trafficker of nontaxpaid distilled spirits." (403 U.S. 573, 575, 29 L. Ed. 2d 723, 729, 91 S. Ct. 2075, 2077.) The court held that the informant's admission of complicity with the defendant in these activities over an extended period of time, which subjected him to possible indictment under section 5205(a) of title 26 of the United States Code (26 U.S.C. sec. 5205(a)), generated some measure of reliability. It was held that under the facts and circumstances of the case that probable cause had been established. Assuming, *arguendo*, that we were to follow the view of the plurality in *Harris* it would have no significance, because there was

no admission against penal interest here.

Concluding that the letter standing alone cannot satisfy the requirements under *Aguilar,* we consider now the State's contention that the "self-verifying detail" within the letter, coupled with the corroborating nature of the information acquired by Detective Mader, established probable cause for the issuance of the search warrant.

The notion of "self-verifying detail" is found in *Spinelli v. United States* (1969), 393 U.S. 410, 417, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589. The court had granted *certiorari* "[b]elieving it desirable that the principles of *Aguilar* should be further explicated ***." (393 U.S. 410, 412, 21 L. Ed. 2d 637, 641, 89 S. Ct. 584, 587.) There are important resemblances between the circumstances here and those in *Spinelli.* A search warrant had been issued, and the affidavit submitted in support of it cited a report from an unidentified informant and also one of an independent FBI investigation which was said to corroborate the informant's tip. The affidavit was more persuading than the one here. It described the informant as "a confidential, reliable informant" and stated that Spinelli was known to the affiant - special agent and to Federal and local law-enforcement officers as a gambler and bookmaker. According to the affidavit the informant had advised the FBI that Spinelli was operating a handbook and was using specified telephone numbers in its operation. The Supreme Court held that the affidavit was insufficient and that the search warrant had been issued without probable cause. The court observed: "Though the affiant swore that his confidant was 'reliable,' he offered the magistrate no reason in support of this conclusion. Perhaps even more important is the fact *Aguilar's* other test has not been satisfied. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was

running a bookmaking operation. We are not told how the FBI's source received his information—it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him. Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable. [Citation.] In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip described the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." (393 U.S. 410, 416, 21 L. Ed. 2d 637, 643-44, 89 S. Ct. 584, 589.) As can be said of the investigative activities by the law-enforcement officers here, the court in *Spinelli* stated: "[W]e find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed. As we have already seen, the allegations detailing the FBI's surveillance of Spinelli and its investigation of the telephone company records contain no suggestion of criminal conduct when taken by themselves—and they are not endowed with an aura of suspicion by virtue of the informer's tip." (393 U.S. 410, 418, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584, 590.) The court commented that the report from the informant was meager and could easily have been obtained from an offhand remark heard at a neighborhood bar.

The court in *Spinelli* did say that while an affidavit may not satisfy the "basis of knowledge" prong of the *Aguilar* test by failing to set out adequately the circumstances explaining how the confidential information was obtained, this may be cured if the information set out is so detailed that a magistrate "could reasonably infer that the informant had gained his information in a reliable

way." (393 U.S. 410, 417, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589.) Thus an informant's report, if detailed sufficiently, may in effect verify itself in the sense that the magistrate, when presented with such detail, can reasonably infer that the informant had gained his information in a reliable way and may be a sufficient basis for a magistrate's finding of probable cause for the issuance of a search warrant. The court cited *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329, a pre-*Aguilar* decision, as a "suitable benchmark" upon which to measure this sufficiency of detail. (393 U.S. 410, 416, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589.) It is important to observe that in *Draper* there was not, as here or in *Spinelli,* an anonymous or unidentified informant but a named informant whose information, when given to law-enforcement officers on earlier occasions, had been reliable.

The use of self-verifying detail to find probable cause is limited, though, to a situation where the informant has not otherwise disclosed the manner in which he has obtained his information and thus has failed to satisfy the "basis of knowledge" prong. While the specificity of detail may be used to supply the basis-of-knowledge requirement, it cannot establish that the informant was credible or his information reliable, in and of itself, so as to meet *Aguilar's* "veracity" prong. The court in *Stanley v. State* (1974), 19 Md. App. 507, 533, 313 A.2d 847, 862, described this when it observed: "The notion that great detail implies personal observation rather than the overhearing of barroom gossip, presupposes an honest informant. If the informant were concocting a story out of the whole cloth, he could fabricate in fine detail as easily as with rough brush strokes. Minute detail tells us nothing about 'veracity.'" See also *People v. Lindner* (1975), 24 Ill. App. 3d 995; Note, *Probable Cause And The First-Time Informer: United States v. Harris, 403 U.S. 573*

*(1971)*, 43 Colo. L. Rev. 357, 362 (1972).

Self-verifying detail discussed in *Spinelli* as a means of satisfying the basis-of-knowledge prong must be accepted with great circumspection. This was expressed by Mr. Justice Harlan when, as appears in the quotation above from *Spinelli*, he cautioned that the tip must describe the claimed criminal activity in detail adequate to show the magistrate that he is relying on information more substantial than casual rumor or an accusation founded only on the accused's general reputation. We cannot say that the information provided here was in sufficient detail to lead a magistrate to conclude that the tip was the product of firsthand knowledge or personal observation.

That the anonymous informant gave the name of the street where the defendants resided and stated that they would be driving from Florida in early May with drugs in the trunk of their car does not even meet the specificity of detail required by the court in *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329, so as to cure the existing deficiency of the "basis of knowledge" prong. Nor can it be reasonably concluded that the information in the letter was acquired through firsthand knowledge rather than by rumor. Also, we reiterate and emphasize that here the informant was anonymous. In *Draper* the informant was named and identified as one who earlier had given information to law-enforcement officers that had been reliable.

The corroborative evidence gathered by Detective Mader, when coupled with the "detail" of the informant's letter, did not constitute probable cause under the tests of *Aguilar*. The appellate court, in addressing this question of corroborative evidence, rejected the State's contention that corroboration can be used to satisfy the "veracity" prong as well as the "basis of knowledge" prong of the *Aguilar* test. The court held that partial corroboration may be considered only to support the

contention that the information obtained was reliable. Citing *Stanley v. State* (1974), 19 Md. App. 508, 531, 313 A.2d 847, 861-62, the court held that corroboration may not serve as a means of satisfying the "basis of knowledge" prong.

Courts are not in agreement on the question of whether partial corroboration, combined with an informant's tip, may cure a deficiency in either prong of the *Aguilar* test. See, *e.g.*, 1 LaFave, Search and Seizure sec. 3.3 (1978); Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer*, 25 Mercer L. Rev. 741 (1974); *Stanley v. State* (1974), 19 Md. App. 507, 313 A.2d 847.

We need not consider this question, however, since the nature of the corroborating "evidence" in this case would satisfy neither the "basis of knowledge" nor the "veracity" prong of *Aguilar*. Looking to the affidavit submitted as support for Detective Mader's request that a search warrant issue, we note that the corroborative evidence here was only of clearly innocent activity. Mader's independent investigation revealed only that Lance and Susan Gates lived on Greenway Drive; that Lance Gates booked passage on a flight to Florida; that upon arriving he entered a room registered to his wife; and that he and his wife left the hotel together by car. The corroboration of innocent activity is insufficient to support a finding of probable cause. See *Whiteley v. Warden of Wyoming State Penitentiary* (1971), 401 U.S. 560, 567, 28 L. Ed. 2d 306, 312-13, 91 S. Ct. 1031, 1036.

For the reasons given above, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE MORAN, dissenting:

The majority concludes that the letter combined with the facts gleaned from the police investigation does not satisfy either prong of the *Aguilar* test. I disagree. As the

opinion points out, the letter did not reveal that the informant had personal knowledge of the criminal activity, the method by which the "basis of knowledge" prong is generally satisfied. However, that prong can be satisfied by sufficiently specific detail and corroborating information. (*Spinelli v. United States* (1969), 393 U.S. 410, 416-17, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589.) That the necessary specificity of the initial information and the requisite corroboration were present here can be demonstrated by a comparison with three United States Supreme Court cases.

*Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329, involved an arrest without a warrant. There, an informant gave a Federal narcotics agent information regarding narcotics law violations. On a motion to suppress, the agent testified that he "had always found the information given by [the informant] to be accurate and reliable." (358 U.S. 307, 309, 3 L. Ed. 2d 327, 329, 79 S. Ct. 329, 331.) No underlying facts established this conclusion. However, the informant told the agent that Draper had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. In addition, the informant described Draper's physical appearance, the clothes he was wearing, that he would be carrying a tan zipper bag, and that he walked quickly. The court found that the agent had probable cause to arrest when a man fitting Draper's description stepped off the specified train.

In *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, police officers, in support of their application for a search warrant, submitted an affidavit stating:

"Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and nar-

cotic paraphernalia are being kept at the above des-
cribed premises for the purpose of sale and use
contrary to the provisions of the law." (378 U.S.
108, 109, 12 L. Ed. 2d 723, 725, 84 S. Ct. 1509,
1511.)

The court found that the information merely reflected
the informant's " 'suspicion,' 'belief' or 'mere conclu-
sion.' " (378 U.S. 108, 114, 12 L. Ed. 2d 723, 729, 84 S.
Ct. 1509, 1514.) In so holding, it established the two-
pronged standard for evaluating if a search warrant should
issue:

"[T]he magistrate must be informed of some of
the underlying circumstances from which the in-
formant concluded that the narcotics were where
he claimed they were, and some of the underly-
ing circumstances from which the officer con-
cluded that the informant, whose identity need not
be disclosed [citation], was 'credible' or his in-
formation 'reliable.' " 378 U.S. 108, 114, 12 L.
Ed. 2d 723, 729, 84 S. Ct. 1509, 1514.

With this test as the standard, the Supreme Court de-
cided *Spinelli v. United States* (1969), 393 U.S. 410, 21
L. Ed. 637, 89 S. Ct. 584. In that case, the affidavit stated
that Spinelli was known to law-enforcement agents as a
bookmaker and a gambler, and that the FBI had "been in-
formed by a confidential reliable informant that William
Spinelli is operating a handbook and accepting wagers and
disseminating wagering information by means of tele-
phones which have been assigned and numbers WYdown
4—0029 and WYdown 4—0136." 393 U.S. 410, 414, 21
L. Ed. 2d 637, 642, 89 S. Ct. 584, 588.

The court contrasted the informant's tip with the in-
formation provided by the informant in *Draper.* The court
concluded that a magistrate could infer from the tip in
*Draper* that the informant had gained his information in a
reliable way whereas, in the case before it, the report could

have been obtained from an offhand remark heard at a neighborhood bar. The court also found that the investigative police work in *Draper* corroborated much more than one small detail and resulted in the inference that the report was reliable. In contrast, the investigation in *Spinelli* corroborated only that Spinelli could have used two telephones for gambling or for some other purpose, and was insufficient to support the reliability of the information. The court stated:

> "[In *Draper*], the police, upon meeting the inbound Denver train on the second morning specified by informer Hereford, saw a man whose dress corresponded precisely to Hereford's detailed description. It was then apparent that the informant had not been fabricating his report out of whole cloth; since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way, it was perfectly clear that probable cause had been established." 393 U.S. 410, 417-18, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 590.

When comparing the affidavits in *Aguilar* and *Spinelli* and the testimony of the agent in *Draper* to the affidavit here, it is clear that this case is more similar to *Draper* than to *Aguilar* and *Spinelli*. In *Aguilar,* the information in the affidavit consisted of mere conclusions and did not satisfy either prong of the standard established here. Similarly, in *Spinelli* the affidavit did not contain a sufficient statement of the underlying circumstances from which the magistrate could conclude that the informer had knowledge that Spinelli was running a bookmaking operation. Further, the court found that although the affiant swore that his confidant was reliable, he offered the magistrate no reason in support of this conclusion.

In this case, however, as in *Draper,* a specific, detailed and *future* sequence of events was supplied by the in-

formant's letter. As already stated, in *Draper* the tip was that a man fitting a particular description had gone to Chicago and would be arriving on a particular train in Denver on one of two specified mornings carrying three ounces of heroin. Here, the letter revealed that on May 3, in compliance with their usual procedure, Sue Gates would be driving down to Florida to purchase drugs. It further stated that Lance Gates would be flying down a few days later to drive their car back to Bloomingdale carrying over $100,000 in drugs in the trunk. The police investigation showed that on May 5 a person matching Lance Gates' description flew to West Palm Beach, Florida, and proceeded to the Holiday Inn West to a room registered to Susan Gates. On May 6, 7 a.m., Gates and an unidentified female left the motel driving a red-vinyl-over-gray Mercury. The investigation disclosed that Gates and the woman left the West Palm Beach area driving northbound on an interstate highway and that the driving time to Bloomingdale was 21 to 23 hours. In this case, as in *Draper,* every detail of the informant's information was corroborated by the police investigation. The specific, detailed information in the letter combined with the corroboration clearly indicates that the informant had an underlying basis of knowledge, satisfying *Aguilar's* first prong.

In addition, the specific information contained in the letter which was then corroborated proved the informant's statements to be credible and reliable, thereby satisfying *Aguilar's* second prong. The majority opinion attempts to distinguish *Draper* by observing in that case there was a named informant who had given the agent reliable information on other occasions. However, the agent's statement as to the informant's reliability was a mere conclusion. It is questionable whether that naked assertion would satisfy *Aguilar's* second prong in that it does not present any underlying circumstances from which the judge could

determine if the informant is credible or his information reliable. The statement is not essentially different from the one made in *Spinelli* that the "informant was reliable." The point is, however, that under the court's analysis in *Spinelli*, the result in *Draper*, in light of *Aguilar*, does not hinge on the mere averment that the informant had previously given reliable information. Rather, the determining factor in establishing probable cause and complying with both prongs of *Aguilar* is the specificity of the tip combined with the police verification by investigation.

Finally, the majority, citing *Whiteley v. Warden of Wyoming State Penitentiary* (1971), 401 U.S. 560, 567, 28 L. Ed. 2d 306, 312-13, 91 S. Ct. 1031, 1036, finds that the corroborating information combined with the tip would not satisfy either prong of the *Aguilar* test because the corroborating evidence was of clearly innocent activity. This conclusion is incorrect. First, in *Whiteley*, the corroborating evidence was simply that the sheriff knew the defendants and the kind of car they drove. The court in *Whiteley* specifically stated:

> "[T]he additional information acquired by the arresting officers must in some sense be corroborative of the informer's tip that the arrestees committed the felony or, as in *Draper* itself, were in the process of committing the felony." 401 U.S. 560, 567, 28 L. Ed. 2d 306, 312-13, 91 S. Ct. 1031, 1036.

In *Draper*, the corroborating information also related to innocent activity—a man fitting a particular description stepped off a train on a specific day carrying a tan zipper bag. Yet, the court in *Whiteley*, as well as in *Spinelli*, clearly held that this type of detailed information can be used to corroborate an informant's tip. The key is whether the corroborative evidence is endowed with an aura of suspicion by virtue of the informant's tip. (See *Spinelli v. United States* (1969), 393 U.S. 410, 418, 21 L. Ed. 2d

637, 645, 89 S. Ct. 584, 590.) In this case, just as in *Draper,* seemingly innocent activity became suspicious in light of the initial tip.

Here, the police went through the desired procedure of obtaining a warrant. The judge had before him, by way of affidavit, information from which he reasonably could conclude that the informat had knowledge that the Gateses were involved in criminal activity and that the information was reliable. Under the standard enunciated in *Spinelli*, the judge could conclude he was relying on more than casual rumor or reputation and that the report had not been fabricated "out of whole cloth." (See *Spinelli v. United States* (1969), 393 U.S. 410, 416, 417, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 590.) Probable cause was determined by a neutral and detached judge. (See *Johnson v. United States* (1948), 333 U.S. 10, 14, 92 L. Ed. 436, 440, 68 S. Ct. 367, 369.) Issuance of a search warrant in the instant case is consistent with the rationale underlying *Aguilar,* as applied in *Spinelli,* and does not attenuate one's right to be free from unreasonable searches and seizures as guaranteed by the United States and Illinois constitutions.

For the above-stated reasons, I must respectfully dissent.

MR. JUSTICE UNDERWOOD joins in this dissent.