2020 IL App (2d) 170695-U
No. 2-17-0695
Order filed April 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-CF-3136 |
| | ) | |
| CALVIN LEWIS CARTER III, | ) | Honorable |
| | ) | John R. Truitt and Fernando L. Engelsma, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly denied the defendant's motion to suppress evidence where the police had reason to believe that the defendant was within the apartment where they attempted to serve an arrest warrant; the defendant failed to show that it was error to sentence him to four consecutive life sentences.

¶ 2    Following a jury trial, defendant, Calvin Lewis Carter III, was convicted of four counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and one count of home invasion (720 ILCS 5/19-6(a)(5) (West 2014)). He appeals. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    We include only those facts necessary to our disposition of the issues raised by defendant. On December 20, 2014, at 11:20 p.m., police officers were dispatched to 3234 Montrose Avenue in Rockford, Illinois, in response to a report of shots fired. Two adults and two young children were fatally shot in the head execution style. The adult female victim was Martia Flint.

¶ 5    The investigation quickly led the police to suspect that defendant was involved in the murders. In searching text messages stored in Martia's cell phone, which the police recovered from the murder scene, they found that she had a soured romantic relationship with defendant. Martia accused him of physical abuse. Among Martia's text messages was a warning to a friend that, if anything happened to her, defendant "did it." The search of Martia's phone also revealed that defendant had repeatedly called and texted her from December 10 to the date of the murders, but not thereafter.

¶ 6    Within hours after the murders, Martia's brother, Mekyial Collins, told the police that he was with Martia twice the previous month when she dropped defendant off at 422 11th Street in Rockford. That address was a duplex. According to Collins, on each occasion defendant entered the 422 side of the duplex from the rear of the building. The police also learned from Collins that defendant lived at 1345 4th Avenue, which was a block and a half from the 11th Street address. That same morning, the police determined that the 4th Avenue property was vacant. Later, the police learned that defendant had lived at the 4th Avenue address with his uncle, Courtney Carter.

¶ 7    The morning after the murders, the police confirmed the existence of an outstanding arrest warrant for defendant from St. Clair County on the charge of misdemeanor theft.

¶ 8    On December 23, 2014, the police again noted that the residence at 1345 4th Avenue was vacant. However, they found a .45 caliber handgun containing one live round behind the garage at that address. The brand of the ammunition inside the gun matched that of 13 spent .45 caliber shell

casings found at the murder scene. The police were unable to locate defendant, although his cell phone was pinging in the area of 422 11th Street.

¶ 9     On December 24, 2014, at 10 a.m., Rockford detectives, including Detective David Paterson, went to the 11th Street address to arrest defendant on the warrant. A common front door shared with 424 11th Street was locked. Through windows, Paterson saw two interior apartment doors, which appeared to be closed.

¶ 10     The detectives circled to the back of the property. They knocked on the door to 422 but no one answered. When they knocked at 424, the tenant, Diane Robinson, answered. She did not recognize defendant's picture. However, she knew that Courtney Carter rented 422. She had not seen Carter, or anyone else, in apartment 422 in some time. She allowed the detectives into a common garage, where a gold BMW belonging to Carter was parked. The police knew that Carter was not using the BMW because he was incarcerated in the county jail. They also had information that the BMW was used in the murders. The record is conflicting with respect to whether Carter allowed defendant to use the BMW. Robinson then gave the detectives access to the front vestibule shared by both apartments.

¶ 11     Paterson was the first detective into the vestibule. He observed that the door to apartment 422 was "slightly ajar." Paterson saw light shining through the cracked-open door. In his written report, Paterson referred to the door only as "unsecured." The detectives performed a two-minute "protective sweep" inside apartment 422, looking for defendant. During the sweep, they noticed a cell phone on a couch. One of the detectives called defendant's number, and the phone on the couch rang. In an upstairs bedroom, the detectives saw mail addressed to defendant. At the end of the sweep, the police left without taking anything. The police then obtained a search warrant for the premises. They recovered numerous items that were introduced in the State's case at trial.

¶ 12    Defendant filed a motion to quash the warrant and suppress evidence on the ground that the entry without a search warrant tainted the later search pursuant to the search warrant. The evidence at the hearing on the motion to suppress was as recounted above. In addition, Robinson testified that, from inside her apartment, she heard the detectives pry open the door to 422. However, a photograph of the door showed no evidence of pry marks.

¶ 13    The court denied the motion to suppress, relying on *People v. Sain*, 122 Ill App. 3d 646 (1984).[1] The court found that the police entered apartment 422 to serve the arrest warrant with reason to believe that defendant was within the premises: defendant was dropped off there multiple times within the last month, his prior address was vacant, and the door to 422 was ajar when Paterson encountered it. The court disbelieved Robinson's testimony that the detectives pried the door open.

¶ 14    The court further found that, even if the entry was unlawful, the police gained nothing that was used in the affidavit for the search warrant. The only items that the police noted in plain view were the cell phone and the mail. The court found that the police knew about the cell phone and defendant's connection to the apartment prior to their entry.

¶ 15    After the jury found defendant guilty of murder and home invasion, the court denied defendant's posttrial motion and sentenced him to four consecutive natural life terms plus 50 years in prison for the murders. The court sentenced defendant to an 80-year term of imprisonment for home invasion, to be served consecutively to the sentences on the murder convictions. Defendant filed a timely appeal.

---

[1] The court rejected the State's many justifications for the initial entry without a search warrant apart from the justification that was based on the outstanding arrest warrant.

¶ 16                                    II. ANALYSIS

¶ 17    Defendant first contends that the court erred in denying his motion to suppress. Defendant

argues that the police had no reason to believe that he was within the premises when they entered

to serve the arrest warrant. See *Payton v. New York*, 445 U.S. 573, 602 (1980) (an arrest warrant

founded on probable cause implicitly carries limited authority to enter a suspect's dwelling when

there is reason to believe the suspect is within); see also *People v. White*, 117 Ill. 2d 194, 209

(1987) (absent exigent circumstances, the police may not enter a suspect's home without an arrest

warrant and reason to believe that the suspect is within). In reviewing a trial court's ruling on a

motion to suppress, we defer to the court's findings of fact, reversing them only if they are against

the manifest weight of the evidence, but we review *de novo* the court's ultimate determination of

whether suppression is warranted. *People v. Burton*, 409 Ill. App. 3d 321, 327 (2011). A decision

is against the manifest weight of the evidence only where the opposite result is clearly evident, or

the determination is unreasonable, arbitrary, or without basis in the evidence. *People v. Hourar*,

365 Ill. App. 3d 682, 686 (2006).

¶ 18    Here, the trial court ruled that our decision in *Sain* controlled. In *Sain*, Officer Arp of the

Lisle Police Department received a dispatch that the victim was receiving harassing phone calls

"again." *Sain*, 122 Ill. App. 3d at 647. The victim believed that the defendant was making the calls

from his residence. *Sain*, 122 Ill. App. 3d at 647. Arp knew of an outstanding arrest warrant for

the defendant on a misdemeanor charge of assault. *Sain*, 122 Ill. App. 3d at 647. Arp went to the

defendant's house, where he saw lights on, although he could not see inside because the curtains

were drawn. *Sain*, 122 Ill. App. 3d at 647. The officer knocked on the unlocked back door, and,

receiving no response, he stepped through the door onto an enclosed porch. *Sain*, 122 Ill. App. 3d

at 648. Finding another unlocked door, Arp entered the lighted kitchen and called out, "Hello,

police." *Sain*, 122 Ill. App. 3d at 648. In the living room, which was illuminated by the kitchen lights, Arp saw a plastic baggie containing suspected cannabis. *Sain*, 122 Ill. App. 3d at 648. Arp later seized the cannabis pursuant to a search warrant. *Sain*, 122 Ill. App. 3d at 648.

¶ 19    The trial court suppressed the cannabis, finding "little to suggest" that Arp reasonably believed that the defendant was within his home. *Sain*, 122 Ill. App. 3d at 648. This court disagreed. We held that (1) it is reasonable to look to a defendant's residence as a place where he or she might be found, and (2) the presence of the lights and the unlocked door gave the officer reason to believe that the defendant was within the house. *Sain*, 122 Ill. App. 3d at 652.

¶ 20    Defendant attempts to distinguish *Sain* on the following grounds. First, in *Sain*, there was no question that the dwelling belonged to the defendant, whereas, here, the police knew that defendant was not the lessee of 422 11th Street. Second, in *Sain*, the dispatch alerted Arp that the defendant had recently made harassing phone calls from his home, whereas, in our case, the police had no information that defendant was within apartment 422. Third, whereas Arp encountered two unlocked doors, in our case, the common front door to the duplex was locked, and the inner front door to apartment 422 appeared to be closed when Paterson saw it through the windows.

¶ 21    These minor factual differences are insufficient to distinguish *Sain*. The police knew that defendant lived with Carter at 1345 4th Avenue and that defendant was also associated with the 11th Street address. The morning after the murders, the police ascertained that the 4th Avenue property was vacant. It was still vacant on the morning of December 24. Therefore, the detectives acted reasonably in going to the 11th Street address to look for defendant. In addition to knowing that defendant's uncle rented 422 11th Street, and that defendant lived with his uncle, they knew that defendant's cell phone was pinging off that address, indicating that defendant may have been

present. Then, Paterson observed the door to 422 standing ajar. Pursuant to *Sain*, the above facts justified the detectives' entry into apartment 422.

¶ 22    However, relying on *People v. Burns*, 2016 IL 118973, defendant further contends that Paterson's observation of the door to apartment 422 from the common vestibule constituted an illegal search. Defendant did not raise this issue before the trial court. Generally, an appellant cannot raise an issue for the first time on appeal. *People v. Weber*, 98 Ill. App. 3d 631, 633 (1981). Issues not raised below are considered forfeited. *Weber*, 98 Ill. App. 3d at 633. However, the State does not argue forfeiture. Accordingly, the State has forfeited the issue of forfeiture. See *People v. Reed*, 2016 IL App (1st) 140498, ¶ 13.

¶ 23    In *Burns*, the police received a tip that the defendant was selling drugs from her apartment. *Burns*, 2016 IL 118973, ¶ 4. The defendant lived on the third floor of a 12-unit locked building, the common areas of which were not accessible to the public. *Burns*, 2016 IL 118973, ¶ 3. There was a small landing outside the doors to the defendant's apartment. *Burns*, 2016 IL 118973, ¶ 3. Acting on the tip, the police entered the building by unknown means at 3:20 a.m. accompanied by a drug-sniffing dog, which alerted at the defendant's apartment door. *Burns*, 2016 IL 118973, ¶ 7. The police then obtained a search warrant for the defendant's apartment, from which they seized marijuana. *Burns*, 2016 IL 118973, ¶ 9. The trial court granted the defendant's motion to suppress the evidence, and the appellate court affirmed, holding that the search warrant was based on an unconstitutional warrantless dog sniff. *Burns*, 2016 IL 118973, ¶¶ 12-13. Our supreme court determined that *Florida v. Jardines*, 569 U.S. 1 (2013), controlled that issue. In *Jardines*, the issue was whether the use of a drug-sniffing dog on a homeowner's porch to investigate the contents of the home was a search within the meaning of the Fourth Amendment. *Jardines*, 569 U.S. at 3. The Supreme Court noted that the Fourth Amendment establishes a "simple baseline," namely, that

when the government obtains information by "physically intruding" on persons, houses, papers, or effects, a search has occurred. *Jardines*, 569 U.S. at 5. The Supreme Court concluded that (1) the porch was part of the curtilage of the home, which was a constitutionally protected area, and (2) the use of a trained police dog to explore the curtilage in hopes of discovering incriminating evidence was an unlicensed physical intrusion. *Jardines*, 569 U.S. at 7-9. Applying *Jardines*, our supreme court in *Burns* held that the landing in front of the defendant's apartment door was the curtilage. *Burns*, 2016 IL 118973, ¶ 41. The next question was whether the officers' investigation was accomplished through "an unlicensed physical intrusion." *Burns*, 2016 IL 118973, ¶ 41. Our supreme court determined that it was, as the police entered the defendant's locked apartment building at 3:20 a.m. with a drug-detection dog. *Burns*, 2016 IL 118973, ¶ 44.

¶ 24    Even if the vestibule area outside the door to apartment 422 was the curtilage, as defendant posits, the constitutional consideration in *Burns* (and *Jardines*)—whether there was an unlicensed physical intrusion—is not present here. See *People v. Bonilla*, 2018 IL 122484, ¶ 24 (it is the act of approaching the defendant's apartment door to have a drug-sniffing dog sniff the threshold that constitutes an unlicensed physical intrusion). Here, Robinson allowed Paterson into the vestibule that she shared with apartment 422. From there, Paterson visually observed the open door to apartment 422. A visual observation is physically nonintrusive. *Jardines*, 569 U.S. at 7. A police officer is not a "special instrument designed to sense what a human being cannot, like a narcotics K-9." *People v. Brandt*, 2019 IL App (4th) 180219, ¶ 37. Therefore, in *Brandt*, the appellate court "outright" rejected the notion that placing a trained drug force officer near an open window of a home when the possession and sale of cannabis is suspected is akin to bringing a dog within a person's curtilage. *Brandt*, 2019 IL App (4th) 180219, ¶ 37. Here, because the police had reason to believe, for purposes of serving the arrest warrant, that defendant was within apartment 422 and

there was no unlicensed physical intrusion involved in Paterson's observation of the open door, we determine that the trial court properly denied defendant's motion to suppress.

¶ 25    Next, defendant argues that we must vacate two of his natural life sentences. The State asserts that defendant forfeited this argument because he did not raise it below. It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion are required. *People v. Walsh*, 2016 IL App (2d) 140357, ¶ 16. The State is correct that defendant did not challenge his sentence before the trial court. However, plain error is a "limited and narrow"exception to the general forfeiture rule. *Walsh*, 2016 IL App (2d) 140357, ¶ 17. While defendant did not raise plain error in his opening brief, he did so in his reply brief. Arguing plain error in a reply brief is sufficient to allow us to review the claimed error. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010).

¶ 26    The State also contends that defendant failed to present a sufficiently complete record for us to decide this issue, because he did not include a record of the sentencing hearing in the report of proceedings. Defendant responds that a report of proceedings is not necessary. As defendant's argument raises a question of law, we agree that a transcript of the hearing is not required. "[W]hile ordinarily, in the absence of a record of the proceedings below, it is presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis," transcripts may be unnecessary "when an appeal confronts solely a question of law, which we review *de novo*." *Watkins v. Office of the State Appellate Defender*, 2012 IL App (1st) 111756, ¶ 19. Consequently, we determine that defendant has not forfeited this issue.

¶ 27    Defendant challenges his sentence under section 9-1(b)(3) of the Criminal Code of 2012 (720 ILCS 5/9-1(b)(3) (West 2018)). That section is not part of the sentencing statutes. It is part of the statutory definition of murder and lists an aggravating factor designed to notify a defendant

of his or her eligibility for the death penalty. *People v. Coleman*, 168 Ill. 2d 509, 550 (1995). It provides that a defendant may be sentenced to death when (1) he or she has been convicted of murdering two or more individuals, and (2) he or she was at least 18 years old at the time of the offenses. 720 ILCS 5/9-1(b)(3) (West 2018). Neither defendant nor the State explains the relevance of section 9-1(b)(3). Effective July 1, 2011, Illinois abolished the death penalty. 725 ILCS 5/119-1 (West 2012). Here, the State included in the indictment a notice that defendant was subject to a sentence of natural life pursuant to section 9-1(b)(3), but it does not appear that section 9-1(b)(3) was ever amended to provide for notice of a life sentence.

¶ 28    Even if section 9-1(b)(3) provides notice of eligibility for a sentence of natural life, defendant does not dispute that he was given notice of his eligibility under this section, as the indictment clearly shows that he was. Instead, in a one-sentence argument, defendant concludes that "[the trial court] was not permitted to impose extended-term sentences on all four of the convictions." Defendant seems to argue that section 9-1(b)(3) limits a life sentence to every two convictions for murder, but he does not engage in any statutory analysis.

¶ 29    As noted, we review this issue under the plain-error doctrine. Plain error is a "limited and narrow" exception to the general forfeiture rule. *Walsh*, 2016 IL App (2d) 140357, ¶ 17. To obtain relief pursuant to the plain-error doctrine, a defendant must show that a clear or obvious error occurred. *Walsh*, 2016 IL App (2d) 140357, ¶ 17. If a clear or obvious error occurred, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny a fair sentencing hearing. *Walsh*, 2016 IL App (2d) 140357, ¶ 17. Here, defendant invokes the second prong of plain error in one conclusory sentence: "[T]he second prong of plain error analysis applies, where the court's improper imposition of two

extended-term sentences, where they were not permitted by law, violated his right to a fair sentencing hearing and his fundamental right to liberty."

¶ 30   Defendant has not demonstrated that a clear or obvious error occurred. Pursuant to section 5-8-1(c)(ii) of the Code of Corrections (730 ILCS 5/5-8-1(c)(ii) (West 2018)), a sentence to a term of natural life imprisonment for murdering more than one victim is mandatory. Defendant does not contend that he was improperly sentenced to four natural life terms under that section. Accordingly, we cannot find that plain error occurred.

¶ 31                                III. CONCLUSION

¶ 32   For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 33   Affirmed.